**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
6/30/26
LAURA A. AUSTIN, CLERK
BY: **/s/L. Ayers**
DEPUTY CLERK

| | |
|---|---|
| Radiology Associates of Roanoke, P.C., ) Montgomery Radiology Associates, Inc., ) ) Plaintiffs, ) ) v. ) ) Optum, Inc., Change Healthcare, Inc., ) UnitedHealth Group Incorporated, ) ) Defendants. ) ) | Civil Action No. __7:26-CV-00527__ (Jury Trial Demand) |

## COMPLAINT

COMES NOW Plaintiffs Radiology Associates of Roanoke, P.C. ("RAR") and Montgomery Radiology Associates, Inc. ("MRA") (collectively, "Plaintiffs"), by and through their undersigned counsel, and for their Complaint against Optum, Inc., UnitedHealth Group Incorporated, and Change Healthcare, Inc. (collectively, "Defendants"), allege the following:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff RAR is a Virginia professional corporation with its principal place of business in Roanoke, Virginia.

2.      Plaintiff MRA is a Virginia professional corporation with its principal place of business in Blacksburg, Virginia.

3.      Defendant Optum, Inc. ("Optum") is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.

4.      Defendant UnitedHealth Group Incorporated ("UHG") is a Delaware corporation with its principal place of business in Minnetonka, Minnesota.

1

5.    Defendant Change Healthcare, Inc., ("Change") is a Delaware corporation with its principal place of business in Nashville, Tennessee.

6.    The Court is vested with subject matter jurisdiction by virtue of 28 U.S.C. § 1332 because Plaintiffs are citizens of Virginia and Defendants are citizens of Delaware, Minnesota, and Tennessee, establishing complete diversity between the parties, and the amount in controversy exceeds $75,000.

7.    The Court has personal jurisdiction because Defendants purposefully directed substantial business activities toward Virginia by providing continuous claims-processing, reimbursement, revenue-cycle management, payment processing, and Medicare-related services to Plaintiffs, Virginia healthcare providers operating within this District.

8.    Defendants routinely processed claims arising from medical services rendered in Virginia, transmitted payments and funds to Plaintiffs in Virginia, and maintained ongoing business relationships with Plaintiffs in Virginia.

9.    The events giving rise to Plaintiffs' claims were expressly directed towards Virginia and caused injury within Virginia.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

11.    Plaintiffs are radiology practices providing diagnostic imaging services in Virginia.

12.    Defendant Optum is a healthcare services and technology company that provides billing, payment processing, and technology services to providers.

13.    Upon information and belief, Defendant Change is a subsidiary of Optum and operates as a healthcare claims-processing company that facilitates the transmission and administration of healthcare claims and payments between insurers and providers.

2

14. Upon information and belief, Defendant UHG is the parent company of Optum and exercised operational control and oversight over the claims-processing and reimbursement functions at issue, and derived substantial financial benefit from those functions.

15. Upon information and belief, certain revenue cycle, billing, and claims-processing services previously performed by McKesson Corporation were integrated into and performed by Change after Optum acquired Change as part of its broader integration within the UHG enterprise.

16. Defendants process, administer, and facilitate reimbursement funds generated from Plaintiffs' radiology services.

17. Plaintiffs exclusively depend on Defendants' platforms to submit claims, verify insurance, and receive payment for radiology services provided to patients, and Plaintiffs pay Defendants for those billing and claims-processing services.

18. On February 21, 2024, Change experienced a cyberattack that caused widespread disruption and outages, rendering Defendants' claims-processing systems inoperable for an extended period of time.

19. During the outage, Plaintiffs could not verify insurance eligibility, determine patient financial responsibility, submit claims, or receive payment for their radiology services.

20. Claims were delayed, left unprocessed, or later denied as untimely despite Plaintiffs' inability to submit them during the outage.

21. To mitigate the disruption, Defendants offered a Temporary Funding Assistance Program ("TFAP"), pursuant to a TFAP Agreement, through which Defendants advanced funds to affected healthcare providers experiencing reimbursement disruptions caused by the cyberattack.

22. The TFAP Agreement was a written click-wrap agreement that conditioned Plaintiffs' repayment obligations on a defined "Repayment Date," triggered only after claims processing resumed and impacted payments were processed.

23. Defendants reserved the right to offset their TFAP advances against claims payments otherwise owed to Plaintiffs if Plaintiffs' repayment obligation was triggered and remained unpaid.

24. Throughout and after the cyberattack, Defendants represented that claims-processing remained disrupted and payments affected by the service disruption remained unresolved, while encouraging Plaintiffs to rely on TFAP funding.

25. In early 2025, despite the Repayment Date not having occurred, Optum demanded repayment of TFAP payments and began withholding current reimbursements and offsetting those funds against disputed TFAP balances.

26. At the time Defendants demanded repayment, substantial numbers of claims affected by the February 2024 cyberattack remained unprocessed, delayed, cancelled, or otherwise unresolved, and impacted payments associated with those claims had not been processed.

27. Plaintiffs had not received payment for substantial portions of the services affected by the cyberattack, leaving Plaintiffs without the revenue necessary to repay the TFAP amounts.

28. By demanding repayment and exercising offsets before the occurrence of the Repayment Date, Defendants caused severe cash-flow disruption and financial distress and exacerbated the operational harm Plaintiffs were already experiencing as a result of the cyberattack.

4

29.     Defendants also performed Medicare-related administrative functions on behalf of MRA, including serving as a centralized conduit for certain Medicare communications and a primary contact for enrollment-related information.

30.     In December 2015, MRA terminated employee John Mangels following his arrest, which ultimately resulted in a felony embezzlement conviction in February 2019.

31.     Defendants were aware that Mangels remained listed in MRA's Medicare enrollment records as a contact and acknowledged the need to remove and correct that information.

32.     Despite that knowledge, Defendants failed to correct the outdated contact information.

33.     In 2021, MRA established a lockbox arrangement through which Medicare regulatory correspondence was routed through Change, and Change was responsible for receiving and monitoring such correspondence.

34.     Through this arrangement, Defendants assumed responsibility for reviewing, routing, and handling time-sensitive Medicare communications, and Plaintiffs relied on Defendants to perform those functions.

35.     Change was also designated as MRA's billing agent within the Medicare Provider Enrollment, Chain, and Ownership System ("PECOS").

36.     On April 10, 2024, Centers for Medicare & Medicaid Services ("CMS") issued a revocation of MRA's Medicare enrollment, retroactive to February 25, 2019, based on the continued inclusion of Mangels in MRA's Medicare enrollment records.

37.     The revocation notice was transmitted through the lockbox arrangement controlled by Defendants and provided sixty-five (65) days for MRA to seek reconsideration.

5

38.    The revocation letter was not discovered until July 9, 2024, after the sixty-five-day reconsideration period had expired, when a Change representative accessed PECOS, observed that MRA's enrollment status was listed as "revoked," and notified MRA later that same day.

39.    At no time did Defendants inform MRA that they were unable to perform their obligations to monitor MRA's lockbox communications due to the cyberattack.

40.    MRA later discovered that its CMS contact email had been assigned to an outdated email associated with a former Change employee, Debra Smith, which was a personal email, and that the contact information had not been updated or monitored.

41.    Due to Defendants' failures to properly maintain enrollment contact information and monitor communications, MRA did not receive the notice within the reconsideration period.

42.    As a direct and proximate result of these failures, MRA lost its opportunity to seek timely reconsideration of the revocation, suffered revocation of its Medicare enrollment, and incurred damages including loss of hospital relationships, regulatory exposure, reputational harm, and substantial financial loss.

43.    Additionally, as a result of Defendants' negligence, MRA lost access to funds CMS had made available to Medicare-enrolled providers affected by Defendants' cyberattack.

44.    MRA's reenrollment process took approximately six months to complete, and MRA continues to face significant operational disruption, reputational harm, and extensive corrective efforts associated with restoring full Medicare participation.

**COUNT I**
**BREACH OF CONTRACT**

45.    Plaintiffs reiterate, reallege, and incorporate by reference the foregoing paragraphs as though fully set forth herein.

6

46.     Defendants formed a valid, binding contract with Plaintiffs through the TFAP Agreement.

47.     Plaintiffs fully performed their obligations under the contract.

48.     The TFAP Agreement expressly conditioned repayment obligations on the occurrence of a defined Repayment Date, which had not occurred because substantial claims affected by the cyberattack remained unresolved and impacted payments associated with those claims had not been processed.

49.     The TFAP Agreement included a provision that, in the event Plaintiffs did not pay the total amount due by the Repayment Date, Defendants were authorized to offset the Funding Amount due from any claims that are processed or otherwise owed to Plaintiffs.

50.     Defendants breached the aforementioned contract by offsetting amounts due from the TFAP Agreement from Plaintiffs' claim payments before the occurrence of the contractual conditions triggering any repayment obligations.

51.     Defendants' withholding and offsetting of claim payments interfered with Plaintiffs' contractual right to receive payment and reimbursement for medical services.

52.     As a direct and proximate result of Defendants' breaches, Plaintiffs have incurred significant monetary damages, including disrupted cash flow, operational instability, and costs incurred to mitigate Defendants' withholding and offsetting conduct.

53.     Plaintiffs are entitled to recover their actual damages, consequential damages, incidental damages, and pre- and post-judgment interest.

## COUNT II
## UNJUST ENRICHMENT

54.     Plaintiffs reiterate, reallege, and incorporate by reference the foregoing paragraphs as though fully set forth herein.

55.     This Count is brought in the alternative to Plaintiffs' breach of contract claim.

56.     Plaintiffs conferred substantial benefits on Defendants through the payment of fees for billing and claims-processing transactions, and by routing healthcare claims, reimbursement transactions, and revenue-cycle functions through Defendants' systems, generating revenue and financial benefit for Defendants.

57.     Defendants knowingly accepted and retained those benefits and exercised control over reimbursement funds by offsetting amounts otherwise payable to Plaintiffs against disputed TFAP balances.

58.     Despite knowingly receiving these benefits, Defendants failed to adequately perform the administrative, billing, reimbursement, communication-routing, and oversight functions to protect Plaintiffs' reimbursement and revenue streams.

59.     Defendants should not be permitted to retain the benefits of fees paid by Plaintiffs and funds generated from Plaintiffs' services where Defendants failed to provide the corresponding services and wrongfully withheld or offset those funds.

60.     Defendants withheld and offset funds owed to Plaintiffs for their medical services against disputed TFAP repayment balances, while Plaintiffs were struggling to maintain baseline operations because of the cyberattack.

61.     Defendants were unjustly enriched through their retention of fees, receipt of financial benefits from Plaintiffs' use of Defendants' systems, and withholding and offsetting of reimbursement funds otherwise payable to Plaintiffs.

62.     It would be unjust for Defendants to retain such benefits without compensating Plaintiffs for the resulting losses.

8

63.    Plaintiffs are entitled to restitution, disgorgement, pre- and post-judgment interest, and such other and further relief as this Court deems proper.

## COUNT III
## NEGLIGENCE

64.    Plaintiffs reiterate, reallege, and incorporate by reference the foregoing paragraphs as though fully set forth herein.

65.    Defendants undertook specialized administrative, enrollment, and regulatory-related responsibility for MRA, including maintaining lockbox communications, overseeing PECOS account management, and routing time-sensitive CMS correspondence.

66.    In performing those specialized duties that existed independently of the reimbursement and payment obligations, Defendants owed MRA a duty to exercise reasonable care, skill, and diligence.

67.    Defendants breached those duties by, among other things, failing to maintain accurate Medicare enrollment records, failing to adequately and timely monitor and transmit the CMS revocation notice, failing to remove outdated contact information, and failing to notify MRA that Defendants' systems were impaired due to the cyberattack.

68.    Defendants knew or should have known that failures in performing these functions could foreseeably result in loss of the opportunity to seek timely reconsideration of the revocation, revocation of Medicare participation, and loss of reimbursement opportunities.

69.    As a direct and proximate result of Defendants' negligence, MRA incurred significant damages, including revocation of Medicare participation, loss of reimbursement opportunities, reputational harm, legal and re-enrollment costs, loss of hospital relationships, disruption of business operations, and other consequential damages.

**RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants providing Plaintiffs with compensatory damages, restitution, disgorgement, pre- and-post judgment interest, attorney's fees and costs, and for any such further relief the Court deems just and proper.

Respectfully submitted this 30th day of June, 2026.

HAFEMANN MAGEE & THOMAS, LLC

*__John R. Thomas, Jr.__*
John R. Thomas Jr.
317 Washington Avenue SW
Roanoke, VA 24011
PH:    (570) 759-1660
jt@fed-lit.com


CAMPBELL TEAGUE LLC
Kristen Farmer Reynolds (#106321)
George Campbell (SC Bar #77409)
110 Edgeworth St.
Greenville, SC 29607
PH:    (864) 326-4186
kristen@campbellteague.com
george@campbellteague.com
*Pro Hac Vice Forthcoming*
*Counsel for Plaintiffs*

10